**CIVILLE & TANG, PLLC**
330 HERNAN CORTEZ AVENUE, SUITE 200
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8868/69
FACSIMILE: (671) 477-2511

*Attorneys for Defendants/Counterclaimants*



**FILED**
DISTRICT COURT OF GUAM
SEP 12 2006 mbo
**MARY L.M. MORAN**
**CLERK OF COURT**

## IN THE UNITED STATES DISTRICT COURT OF GUAM

| | |
|---|---|
| NIPPO CORPORATION, ) | CIVIL CASE NO. CV06-00020 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **ANSWER TO AMENDED** |
| INTERNATIONAL BRIDGE CORPORATION, ) | **COMPLAINT; COUNTERCLAIM;** |
| INTERNATIONAL BRIDGE AND ) | **DEMAND FOR JURY TRIAL** |
| CONSTRUCTION/MARIANAS, INC., INTER ) | |
| BAY CIRCLE MARINE, AND WILLIAM E. ) | |
| TOELKES, ) | |
| ) | |
| Defendants. ) | |
| ————————————————) | |
| ) | |
| INTERNATIONAL BRIDGE CORPORATION, ) | |
| and INTERNATIONAL BRIDGE AND ) | |
| CONSTRUCTION/MARIANAS, INC., ) | |
| ) | |
| Counterclaimants, ) | |
| ) | |
| vs. ) | |
| ) | |
| NIPPO CORPORATION, ) | |
| ) | |
| Counterclaim Defendants. ) | |
| ————————————————) | |

Defendants International Bridge Corporation, International Bridge and

Construction/Marianas, Inc., Inter Bay Circle Marine and William E. Toelkes (hereinafter

ORIGINAL

collectively "Defendants"), in response the allegations set forth in the Amended Complaint, state as follows:

**FIRST DEFENSE**

The Amended Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

**SECOND DEFENSE**

As a Second Defense, Defendants:

1. Admit the allegations in paragraph 1 of the Amended Complaint.

2. Admit the allegations in paragraph 2 of the Amended Complaint.

3. Admit the allegations in paragraph 3 of the Amended Complaint.

4. Admit the allegations in paragraph 4 of the Amended Complaint.

5. Admit the allegations in paragraph 5 of the Amended Complaint.

6. Admit the allegations in paragraph 6 of the Amended Complaint.

7. Deny the allegations in paragraph 7 of the Amended Complaint.

8. Responding to the allegations contained in paragraph 8 of the Amended Complaint, Defendants reallege and incorporate their answers to paragraphs 1 through 7 of the Amended Complaint as though fully set forth herein.

9. With respect to the allegations in paragraph 9 of the Amended Complaint, admit that Nippo and IBC entered into a number of separate joint venture and subcontracts and that some of the projects listed in paragraph 9 were only joint venture projects, some were joint venture projects with subcontracts and sub-subcontracts between the parties, and two projects were

2

undertaken as joint ventures without formal joint venture agreements. All other allegations therein are denied.

10. Deny the allegations in paragraph 10 of the Amended Complaint.

11. Deny the allegations in paragraph 11 of the Amended Complaint.

12. Deny the allegations in paragraph 12 of the Amended Complaint, except to admit that some payments from project owners to the Joint Venture were deposited by the owners into an IBC account at the KAW Valley Bank in Kansas.

13. Deny the allegations in paragraph 13 of the Amended Complaint..

14. Deny the allegations in paragraph 14 of the Amended Complaint.

15. Deny the allegations in paragraph 15 of the Amended Complaint.

16. Responding to the allegations contained in paragraph 16 of the Amended Complaint, Defendants reallege and incorporate their answers to paragraphs 1 through 15 of the Amended Complaint as though fully set forth herein.

17. Deny the allegations in paragraph 17 of the Amended Complaint.

18. Deny the allegations in paragraph 18 of the Amended Complaint.

19. Responding to the allegations contained in paragraph 19 of the Amended Complaint, Defendants reallege and incorporate their answers to paragraphs 1 through 18 of the Amended Complaint as though fully set forth herein.

20. Deny the allegations in paragraph 20 of the Amended Complaint.

21. Deny the allegations in paragraph 21 of the Amended Complaint.

22. Deny the allegations in paragraph 22 of the Amended Complaint.

23. Deny the allegations in paragraph 23 of the Amended Complaint.

3

24.     Responding to the allegations contained in paragraph 24 of the Amended Complaint, Defendants reallege and incorporate their answers to paragraphs 1 through 23 of the Amended Complaint as though fully set forth herein.

25.     Paragraph 25 of the Amended Complaint sets forth conclusions of law, not allegations of fact requiring an answer. To the extent an answer is deemed necessary, the allegations therein are an incomplete recitation of the law and are denied.

26.     Deny the allegations in paragraph 26 of the Amended Complaint.

27.     Deny the allegations in paragraph 27 of the Amended Complaint.

28.     Deny the allegations in paragraph 28 of the Amended Complaint.

29.     Responding to the allegations contained in paragraph 29 of the Amended Complaint, Defendants reallege and incorporate their answers to paragraphs 1 through 28 of the Amended Complaint as though fully set forth herein.

30.     Deny the allegations in paragraph 30 of the Amended Complaint.

31.     Deny the allegations in paragraph 31 of the Amended Complaint.

32.     Responding to the allegations contained in paragraph 32 of the Amended Complaint, Defendants reallege and incorporate their answers to paragraphs 1 through 31 of the Amended Complaint as though fully set forth herein.

33.     Deny the allegations in paragraph 33 of the Amended Complaint.

34.     Deny the allegations in paragraph 34 of the Amended Complaint.

35.     Deny the allegations in paragraph 35 of the Amended Complaint.

36.     All other allegations in the Amended Complaint not specifically addressed above are denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
(Failure to Mitigate)

Defendants affirmatively allege that Plaintiff is barred, in whole or in part, from recovering damages because Plaintiff did not act reasonably to protect itself or to mitigate any damages which Plaintiff might have sustained (the existence of which is expressly denied by Defendants).

### SECOND AFFIRMATIVE DEFENSE
(Set-Off)

Nippo has collected money on the various projects on which it is a Joint Venture partner with IBC . Pursuant to agreements between IBC and Nippo, IBC is entitled to all or a portion of such collections. IBC is entitled to set off the amount of collections owed to it against any amount which it may be determined IBC owes to Nippo. IBC and Nippo have further entered into various agreements under which the proceeds from the sale of certain assets, or the proceeds from certain claims will be retained by Nippo. IBC is entitled to set off the amount of proceeds received from such sales or claims against any amount which it may be determined IBC owes to Nippo. IBC has expended its own funds on joint venture projects for which it is entitled to reimbursement. IBC is entitled to set off the amount of such expenditures against any amount which it may be determined IBC owes to Nippo. has expended money is indebted to Defendant IBC by virtue of Plaintiff's wrongful conduct and that such indebtedness is a complete and/or partial set-off of the damages, if any, suffered by Plaintiff.

### THIRD AFFIRMATIVE DEFENSE
(Good Faith)

Defendants affirmatively allege that at all relevant times Defendants acted in good faith, and Plaintiff is therefore barred from any recovery.

5

## FOURTH AFFIRMATIVE DEFENSE
(Consent)

Defendants affirmatively allege that at all material times Plaintiff consented to, agreed to, and acquiesced in, all of Defendants' alleged actions and conduct that allegedly caused damage and injury to Plaintiff, and therefore, each of Plaintiff's causes of action is barred.

## FIFTH AFFIRMATIVE DEFENSE
(Accord and Satisfaction)

One or more matters on which the Plaintiff seeks to litigate is the subject of an accord and satisfaction.

## SIXTH AFFIRMATIVE DEFENSE
(Claims Not Ripe)

Plaintiff appears to allege claims relating to the AMEC, Palmer, Koukuk, Anvik, AF IDIQ and the MACC projects. Work on those projects has not yet been completed and claims relating to those projects are not ripe for adjudication. Additionally, Nippo appears to be asserting claims relating to Wake Island and the Route 4 projects for which claims against the project owner have been submitted or should be submitted, and the claims relating to those projects are not ripe for adjudication until such claims against the owner have been resolved.

## SEVENTH AFFIRMATIVE DEFENSE
(Comparative Negligence-Bar)

To the extent any of Nippo's claims are characterized as tort claims, any injuries or damages Nippo sustained were caused primarily by its own negligence, and its claims are therefore barred.

6

### EIGHTH AFFIRMATIVE DEFENSE
(Comparative Negligence-Reduction of Claim)

To the extent any of Nippo's claims are characterized as tort claims, any injuries or damages Nippo sustained were partially caused by its own negligence, and its damages, if any, must be reduced by the percentage of causal negligence attributable to it.

### NINTH AFFIRMATIVE DEFENSE
(Estoppel)

Defendants affirmatively allege that each and every purported cause of action alleged in Plaintiff's Amended Complaint is barred by the equitable doctrine of estoppel.

### TENTH AFFIRMATIVE DEFENSE
(Proper Use of Funds)

IBC affirmatively alleges that the $6,000,000 which Nippo claims was wrongfully diverted and unaccounted for, was in fact applied to joint venture projects, and for the use and benefit of the joint venture partners on such projects.

### ELEVENTH AFFIRMATIVE DEFENSE
(Excused by Nippo's prior material breaches)

In the event Nippo is found to have breached any of the agreements alleged in Plaintiff's complaint (which Defendants expressly deny), any such breaches were excused by Nippo's prior material breaches of the agreements.

### TWELFTH AFFIRMATIVE DEFENSE
(Excused by Nippo's Failure to Perform)

IBC affirmatively alleges that Plaintiff has failed to perform the obligations applicable to Plaintiff under the agreements between Nippo and IBC.

7

## THIRTEENTH AFFIRMATIVE DEFENSE
(Unclean Hands)

Defendants affirmatively allege that Nippo has unclean hands and is therefore not entitled

to the relief requested in the complaint.

## FOURTEENTH AFFIRMATIVE DEFENSE
(Waiver)

Defendants affirmatively allege that each and every purported cause of action alleged in

Plaintiff's complaint is barred by the equitable doctrine of waiver.

## FIFTHTEENTH AFFIRMATIVE DEFENSE
(Justification)

Defendants affirmatively allege that Defendants' actions and conduct toward Plaintiff were

at all material times justified and privileged, and therefore Defendants are not liable for such

conduct and actions if the conduct and actions caused damage or injury to Plaintiff.

## SIXTEENTH AFFIRMATIVE DEFENSE
(Punitive Damage Claim Unconstitutional and Inorganic)

An award of punitive damages would violate the Defendants' due process rights guaranteed

by the Constitution of the United States and the Organic Act of Guam in that Plaintiff claims

punitive damages which, as a ratio to actual harm suffered, is unconstitutionally disparate and

excessive.

8

## COUNTERCLAIM

International Bridge Corporation ("IBC") and International Bridge & Construction / Marianas, Inc. ("IBCM") on Counts Three and Six only, allege the following as Counterclaims against Nippo Corporation ("Nippo"):

### JURISDICTION

1.      This Court has jurisdiction over this action based on diversity of citizenship under 28 USC §1332. The amount in controversy exceeds $75,000.00.

### VENUE

2.      Venue is proper in this District pursuant to 18 U.S.C. §1965(a) and (b), which provide that venue is proper in a District where defendant resides, is found, has an agent or transacts its affairs, or where the ends of justice require parties residing in other Districts be brought before the Court, and because each of the defendants are doing business here or have received benefits from doing business here.

### PARTIES

3.      IBC is, and at all times herein relevant was, a corporation organized and existing under the laws of the State of Ohio with its principal place of business in Yigo, Guam, and authorized to transact business in Guam. IBCM is a corporation organized under the laws of the CNMI, and licensed to transact business in Guam.

4.      Nippo is, and at all times herein relevant was, a corporation organized and existing under the laws of the Nation of Japan with its principal place of business in Tokyo, Japan.

9

## BACKGROUND

5.     Nippo and IBC are both companies with substantial experience in construction with a particular emphasis on road and runway construction.

6.     In late 2000, after having successfully worked on other projects in a contractor - subcontractor relationship, IBC and Nippo agreed to pursue government construction contracts as joint venture partners.

7.     Between 2000 and 2005, IBC and Nippo, as joint venture partners, submitted bids on approximately 43 projects. Nippo and IBC entered into separate written joint venture agreements for each project that was bid as a joint venture project, with the exception of two projects for which the parties did not execute a written joint venture agreement.

8.     The joint venture agreements between the parties generally provided that the profits and losses of the joint venture would be divided according to an agreed upon ratio, which varied from agreement to agreement.

9.     A common feature of the joint venture agreements was the agreement that, if the joint venture was awarded the contract, Nippo was required to "provide from time to time working capital that is then necessary and required to carry out and perform the Contract."

10.     At Nippo's insistence, in all but three instances, when an IBC / Nippo joint venture was awarded a contract, the joint venture would enter into a subcontract with Nippo under which the work under the project was subcontracted to Nippo and the joint venture agreed to pay Nippo all money received by the joint venture from the project owner.

11.     In those instances when the joint venture entered into a subcontract with Nippo as described above, Nippo would shortly thereafter enter into a sub-subcontract with IBC under which

10

IBC agreed "to furnish all supervision, labor, tools, equipment, materials, supplies, transportation and incidentals necessary or required and to perform all work" on the project.

12.     The sub-subcontracts between Nippo and IBC would further provide that a specified percentage of the money paid by the owner on the project would be paid to IBC in its capacity as sub-subcontractor.

13.     From the inception of the joint venture agreements, until January 19, 2006, IBC was the Managing Party to each of the joint venture agreements.

14.     On January 19, 2006 the parties entered into a Joint Venture Agreement Amendment ("JV Amendment"), which they agreed would be effective as of December 1, 2005. Under the JV Amendment, Nippo became the Managing Party to certain of the joint venture projects.

15.     In late January, or the first week of February, 2006 Nippo installed its own management team to manage those projects which were still ongoing and IBC has not had any management control or input into the projects since that date.

## COUNT ONE
(Breach of Contract – Equipment Rental Agreement)

16.     IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

17.     On or about January 24, 2006, IBC and Nippo entered into an Agreement for Rental of Agreement ("Equipment Rental Agreement"), effective December 1, 2005, pursuant to which Nippo rented from IBC certain equipment, as described in exhibits attached to the Equipment Rental Agreement.

11

18. The equipment rented under the Equipment Rental Agreement belonged to IBCM, and had been leased by IBCM to IBC.

19. The Equipment Rental Agreement was drafted by Nippo.

20. One of the projects for which Nippo rented equipment from IBC was the AAFB North Runway project ("AMEC Project").

21. In furtherance of the prosecution on the work on the AMEC project, IBC, using a vessel owned by InterBay Circle Marine ("Inter Bay"), made two trips to transport equipment to Makassar, Indonesia for the purpose of loading cement to be used in the AMEC project on Guam. The majority of the equipment was shipped to Indonesia in November 2005, and three pieces were shipped on January 29, 2006.

22. The majority of the equipment shipped to Makassar Indonesia was leased to Nippo in the Equipment Rental Agreement executed on January 24, 2006.

23. In order to land the equipment in Indonesia on temporary basis, the equipment was landed as ship's gear of Inter Bay's tug the M/V June T.

24. Indonesian law requires that the equipment be removed on the same vessel on which it entered Indonesia, in this instance the M/V June T.

25. The cement loaded in Indonesia using the equipment leased by Nippo was transported to Guam and has been and continues to be used in the AMEC Project.

26. The loading of cement in Indonesia was completed in late April, 2006 and the equipment is ready to be returned to Guam.

12

27. The Equipment Rental Agreement provides, among other things, "that without limitation Nippo undertakes to return the Equipment to IBC at the end of the relevant term of rental at a location designated by IBC in the Territory of Guam..."

28. On or about May 20, 2006, John M. Robertson, the project manager selected by Nippo, assured IBC that Nippo would pay the cost of having the equipment returned from Indonesia to Guam.

29. Nippo has breached the Equipment Rental Agreement in that it refuses to return the equipment in Indonesia to Guam, and it has attempted to repudiate its obligations under the Equipment Rental Agreement with respect to that equipment.

30. As a result of Nippo's breach of its duties under the Equipment Rental Agreement, IBC has incurred, or will incur, damages in the amount of not less than $550,000.00 in penalties and fines levied by the Indonesian government, and in costs to bring the equipment back to Guam at IBC's expense.

31. As a result of Nippo's breach of the Equipment Rental Agreement, IBC has lost the use of the equipment while the equipment is in Indonesia, and has lost the income that could have been generated from such use, or from the further rental of the equipment.

32. As a result of Nippo's breach of the Equipment Rental Agreement, as set forth in this Count above, IBC is entitled to judgment in the amount of not less than $550,000.00 or such higher amount as may be proven at trial.

### COUNT TWO
(Breach of Contract AF IDIQ)

33. IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

13

34.     On or about December 22, 2000, the United States Air Force issued a Multi-year Indefinite Quantity Asphalt Supply contract ("AF IDIQ") to IBC separately and not as a joint venture partner.

35.     With respect to the AF IDIQ project, IBC entered into a subcontract with Nippo under which all work on the project was to be completed by Nippo and all funds received from the Air Force under the contract were to be paid to Nippo.

36.     Under the Nippo subcontract, IBC agreed to pay Nippo all money the Joint Venture received from the Air Force on the AF IDIQ project.

37.     On or about April 25, 2002, Nippo entered into a sub-subcontract with IBC under the terms of which IBC agreed to perform the work required on the AF IDIQ project, and Nippo agreed to pay the costs of the project.

38.     Under the sub-subcontract agreement, the parties agreed that IBC would be paid 95% of all money received from the Air Force on the AF IDIQ project.

39.     In November 2004, IBC and Nippo entered into a letter agreement which the Air Force termed a "novation agreement," pursuant to which IBC and Nippo advised the Air Force that they would thereafter prosecute the work on the AF IDIQ project as a joint venture. The Air Force consented to this novation.

40.     Nippo and IBC did not formalize in writing the joint venture agreement on this project.

41.     Periodically the Air Force issued new task orders for the AF IDIQ project. After the formation of the joint venture, IBC and Nippo proceeded on these new task orders in the manner provided in the subcontract and sub-subcontracts.

14

42.     On or about January 19, 2006 Nippo and IBC entered into a Joint Venture Agreement Amendment ("Amended Agreement") under which the parties agreed, inter alia, that the joint venture agreements and subcontracts would "continue in effect" except as specifically modified by the Amended Agreement.

43.     IBC faithfully and fully performed all duties required of it under the sub-subcontract agreement through late January 2006 at which time Nippo took control of the management of the project.

44.     Nippo's actions in taking over the management of the project interfered with IBC's ability to carry out its duties under the sub-subcontract, and were a breach of the sub-subcontract by Nippo.

45.     Work on the AF IDIQ project is substantially complete except for one work order.

46.     The Air Force has paid Nippo additional money on the AF IDIQ project following Nippo's assumption of control over the project.

47.     IBC is entitled to 95% of the payments received from the Air Force on the project, less certain amounts advanced by Nippo as job costs.

48.     Nippo has breached its duties under the sub-subcontract in that it has failed to pay to IBC 95% of the money received from the Air Force on the project, less legitimate job cost expenses.

49.     As a result of Nippo's breach of contract, as set forth above, IBC has suffered damages in the amount of not less than $1,350,000.00.

50.     As a result of Nippo's breach of the AF IDIQ sub-subcontract, as set forth above, IBC is entitled to judgment in the amount of not less than $1,350,000.00 and such higher amount as may be proven at trial.

## COUNT THREE
### (Quantum Meruit  AF IDIQ)

51.     IBCM incorporates the allegations set forth in paragraphs 1 through 15 and 34 through 50 of this counterclaim as though set forth herein.

52.     Nippo has materially breached the sub-subcontract between Nippo and IBC on the AF IDIQ project.

53.     IBCM  provided construction equipment and asphalt and other materials to Nippo which were used on the AF IDIQ project.  Nippo requested and accepted such materials and those materials were used on the project.

54.     The fair market value of the equipment and materials supplied by IBCM to Nippo for use on the AF IDIQ project was $1,326,635.00.

55.     IBCM has provided Nippo with invoices for the equipment and materials used on the AF IDIQ project, but Nippo has refused and continues to refuse to pay such invoices.

56.     IBCM is entitled to judgment against Nippo in the amount of not less than $1,326,635.00, or such greater amount as may be proven at trial,  for the value of the equipment and  materials IBCM provided and Nippo used on the AF IDIQ project.

## COUNT FOUR
### (Mismanagement of AF IDIQ Project)

57.     IBC incorporates the allegations set forth in paragraphs 1 through 15 and 34 through 50 of this counterclaim as though set forth herein.

16

58.    In late January, 2006, Nippo took over management control of the work on the AF IDIQ project.

59.    Nippo had, and continues to have, a duty to use due diligence and reasonable care in prosecuting the work on the project.

60.    Nippo has failed and continues to fail to provide IBC with monthly balance sheets and job profit and loss statements, monthly cost reports and cost projections compared with Bid estimates and cash flow projections.

61.    Nippo has breached its duty and has negligently managed the project by, among other things, hiring and using subcontractors other than IBC at a significantly higher cost to the project, and by changing management teams at least two times, thereby creating inefficiencies and driving up costs on the project.

62.    IBC is entitled to set off the costs of such negligent management and inefficient and wasteful conduct against any claim that Nippo may have against IBC for costs incurred by Nippo on the project.

63.    IBC is entitled to judgment against Nippo for damages resulting from Nippo's mismanagement of the AF IDIQ project in an amount to be proven at trial following a complete audit of Nippo's records on the project.

## COUNT FIVE
(Breach of Contract – Navy MACC)

64.    IBC incorporates the allegations set forth in paragraphs 1 through 15of this counterclaim as though set forth herein.

17

65.     On or about August 15, 2003 IBC and Nippo entered into a written Bidding and Joint Venture Agreement with respect to a Multiple Award Construction Contract (MACC) for paving and other related work ("Navy MACC project") being issued by the United States Navy.

66.     Under the terms of JV Agreement, Nippo agreed to "provide from time to time working capital that is then necessary and required to carry out and perform the Contract."

67.     Beginning on or about September 26, 2003, the Navy awarded a contract for the Navy MACC project to an Nippo / IBC Joint Venture.

68.     Work under the Navy MACC project contract was broken down by work orders issued by the Navy. Subsequent to the initial work orders, the Navy has periodically issued additional work orders under the contract.

69.     On about November 11, 2003, the Nippo / IBC Joint Venture entered into a subcontract with Nippo for the work under the Navy IDIQ project.

70.     Under the subcontract to Nippo the Joint Venture agreed to pay Nippo all money the Joint Venture received from the Navy on the MACC project.

71.     On or about November 11, 2003 Nippo entered into a sub-subcontract with IBC under the terms of which IBC agreed "to furnish all supervision, labor, tools, equipment, materials, supplies, transportation and incidentals necessary or required to perform, and to perform all work" under the Navy MACC contract.

72.     Under the sub-subcontract agreement, the parties agreed that IBC would be paid 92% of all money received from the Navy on the initial Task Orders plus 92% of all money received from the Navy of any "new contract amount" under the MACC contract.

73.	IBC faithfully and fully performed all duties required of it under the sub-subcontract agreement through late January 2006 at which time Nippo took control of the management of the project.

74.	Nippo's actions in taking over the management of the project interfered with IBC's ability to carry out its duties under the sub-subcontract, and were a breach of the sub-subcontract by Nippo.

75.	The Navy has paid additional money on the MACC project following Nippo's assumption of control over the project.

76.	IBC is entitled to 92% of the payments received from the Navy on the project, less certain amounts advanced by Nippo as job costs.

77.	Nippo has breached its duties under the sub-subcontract in that it has failed to pay to IBC 92% of the money received from the Navy on the project, less legitimate job cost expenses.

78.	As a result of Nippo's breach of contract, as set forth above, IBC has suffered damages in the amount of not less than $1,450,000.00 after deducting legitimate job costs expenses.

79.	As a result of Nippo's breach of the Navy MACC sub-subcontract, as set forth above, IBC is entitled to judgment in the amount of not less than $1,450,000.00 and such higher amount as may be proven at trial.

## COUNT SIX
(Material and Equipment Navy – MACC)

80.	IBCM incorporates the allegations set forth in paragraphs 1 through 15 and 65 through 79 of this counterclaim as though set forth herein.

81.     Nippo has materially breached the sub-subcontract between Nippo and IBC on the MACC project.

82.     IBCM provided construction equipment and asphalt and other materials to Nippo which were used on the MACC project. Nippo requested and accepted such materials and those materials were used on the project.

83.     The fair market value of the equipment and materials supplied by IBC to Nippo for use on the Navy MACC project was $1,374,569,000.00.

84.     IBCM has provided Nippo with invoices for the equipment and materials used on the Navy MACC project, but Nippo has refused and continues to refuse to pay such invoices.

85.     IBCM is entitled to judgment against Nippo in the amount of not less than $1,374,569.00, or such greater amount as may be proven at trial, for the value of the equipment and materials IBCM provided and Nippo used on the Navy MACC project.

### COUNT SEVEN
(Mismanagement MACC)

86.     IBC incorporates the allegations set forth in paragraphs 1 through 15 and 65 through 79 of this counterclaim as though set forth herein.

87.     In January 2006, Nippo took over control of the operation and work on the Navy MACC project.

88.     Nippo had, and continues to have, a duty to use due diligence and reasonable care in prosecuting the work on the project.

89.     Nippo has breached its duty and had negligently managed the project by, among other things, hiring and using subcontractors other than IBC at a significantly higher cost to the

20

project, and by changing management teams at least two times, thereby creating inefficiencies and driving up costs on the project.

90.　　IBC is entitled to set off the costs of such negligent management and inefficient and wasteful conduct against any claim that Nippo may have against IBC fo costs incurred by Nippo on the project.

91.　　The mismanagement by Nippo has resulted in damages to IBC in an amount of not less than $150,000, and IBC is entitled to judgment against Nippo as a result of such mismanagement in the amount of $150,000 or such higher amount as may be proven at trial.

## COUNT EIGHT
(PAIP XII)

92.　　IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

93.　　On or about June 8, 2004 IBC and Nippo entered into a written Bidding and Joint Venture Agreement with respect to a RFP No. FA5240-04-R-005, Improve Military Family Housing Project ("PAIP XII") being issued by the United States Air Force.

94.　　On or about August 26, 2004, the United States Air Force awarded the PAIP XII contract ("PAIP XII") to the Nippo / IBC Joint Venture.

95.　　On or about September 2, 2004, the Nippo / IBC Joint Venture entered into a subcontract with Nippo for the work under the PAIP XII project.

96.　　Under the Nippo subcontract, the Nippo / IBC Joint Venture) agreed to pay Nippo all money the Joint Venture received from the Air Force on the PAIP XII project.

21

97.     On or about September 4, 2004, Nippo entered into a sub-subcontract with IBC under the terms of which IBC agreed to perform the work required on the PAIP XII project, and Nippo agreed to pay the costs of the project.

98.     The parties anticipated that there would be further work under the PAIP XII contract and the sub-subcontract agreement provided that IBC would be paid 94% of all money received from the Air Force on the PAIP XII project.

99.     IBC faithfully and fully performed all duties required of it under the sub-subcontract agreement through late January 2006 at which time Nippo took control of the management of the project.

100.    Nippo's actions in taking over the management of the project interfered with IBC's ability to carry out its duties under the sub-subcontract, and were a breach of the sub-subcontract by Nippo.

101.    The Air Force has paid additional money on the PAIP XII project following Nippo's assumption of control over the project.

102.    IBC is entitled to 94% of the payments received from the Air Force on the project, less certain amounts advanced by Nippo as job costs.

103.    Nippo has breached its duties under the sub-subcontract in that it has failed to pay to IBC 94% of the money received from the Air Force on the project, less legitimate job cost expenses.

104.    As a result of Nippo's breach of contract, as set forth above, IBC has suffered damages in the amount of not less than $1,375,000.00 after deducting legitimate job costs expenses.

22

105.    As a result of Nippo's breach of the AF IDIQ sub-subcontract, as set forth above, IBC is entitled to judgment in the amount of not less than $1,375,000.00 and such higher amount as may be proven at trial.

## COUNT NINE
### (PAIP XII – Mismanagement)

106.    IBC incorporates the allegations set forth in paragraphs 1 through 15  and 93 through 105 of this counterclaim as though set forth herein.

107.    Nippo had, and continues to have, a duty to use due diligence and reasonable care in prosecuting the work on the project.

108.    Nippo has breached its duty and has negligently managed the project by, among other things:  hiring and using subcontractors other than IBC at a significantly higher cost to the project; inefficiently demobilizing the work force which resulted in significant unnecessary labor costs; changing supervision at least twice which caused additional costs; and unnecessarily subcontracting out landscaping work.

109.    IBC is entitled to a judgment for damages, or in the alternative a setoff equal to the costs of such mismanagement and inefficient and wasteful conduct, in an amount of not less than $400,000, or such greater amount as may be proven at trial.

## COUNT TEN
### (PAIP X)

110.    IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

111.     On or about February 4, 2002 IBC and Nippo entered into a written Bidding and Joint Venture Agreement under with respect to a Improve Military Housing (PAIP X) Anderson Air Force Base construction contract ("PAIP X") being issued by the United States Air Force.

112.     Under the terms of JV Agreement, Nippo agreed to "provide from time to time working capital that is then necessary and required to carry out and perform the Contract."

113.     On or about May 31, 2002 the United States Air Force awarded the PAIP X contract to the IBC / Nippo joint venture.

114.     On or about June 13, 2002 the IBC / Nippo Joint Venture entered into a subcontract with Nippo for the work under the PAIP X project.

115.     Under the subcontract to Nippo the Joint Venture agreed to pay Nippo all money the Joint Venture received from the Air Force on the PAIP X project.

116.     On or about June 19, 2002, Nippo entered into a sub-subcontract with IBC under the terms of which IBC agreed to perform the work required on the PAIP X project, and Nippo agreed to pay the costs of the project.

117.     Under the sub-subcontract agreement, the parties agreed that IBC would be paid 94% of all money received from the Air Force on the PAIP X project.

118.     Work on the PAIP X project was completed in 2004.

119.     The Joint Venture has submitted a claim to the Air Force in the amount of $492,000 for work performed by IBC on the PAIP X project.  The Air Force has approved $320,000, although this amount has not yet been paid.

120.     IBC is entitled to 94% of the approved claim amount, i.e. $300,800, and is entitled to judgment against Nippo in the amount of $300,800.

24

## COUNT ELEVEN
### (Route 4)

121.    IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

122.    On or about December 19, 2001 IBC and Nippo entered into a written Bidding and Joint Venture Agreement with respect to a solicitation for bids issued by the Guam Department of Public Works ("DPW") for the reconstruction and widening of Route 4 on Guam ("Route 4 project").

123.    Under the terms of JV Agreement, Nippo agreed to "provide from time to time working capital that is then necessary and required to carry out and perform the Contract."

124.    On or about October 2, 2002 DPW awarded the Route 4 project to the IBC / Nippo Joint Venture.

125.    On or about October 3, 2002 the IBC / Nippo Joint venture entered into a subcontract with Nippo for the work under the Route 4 project.

126.    Under the subcontract to Nippo, the Joint Venture agreed to pay Nippo all money the Joint Venture received from DPW on the Route 4 project.

127.    On or about October 7, 2002 Nippo entered into a sub-subcontract with IBC under the terms of which IBC agreed to perform the work required on the Route 4 project, and Nippo agreed to pay the costs of the project.

128.    Under the sub-subcontract agreement, the parties agreed that IBC would be paid 94% of all money received from DPW on the Route 4 project.

129.    IBC faithfully and fully performed all duties required of it under the sub-subcontract agreement and work on the project has substantially completed.

25

130. IBC, as sub-subcontractor, has a claim against Nippo, as contractor for $2,626,788.00 based on: impact costs; loss productivity due to multiple change orders; idle equipment costs; constructive delay costs; suspension of work; differing site conditions; design defects; out of sequence work; and, unabsorbed home office costs.

131. IBC, as a sub-subcontractor, is entitled to judgment against Nippo, as subcontractor, in the amount of $2,626,788.00.

132. Pursuant to the JV Amendment, Nippo has undertaken responsibility for prosecuting a claim against DPW on behalf of the Joint Venture, and the amount recovered on such claim is to be set off against any amounts owed by IBC to Nippo.

133. Nippo has a duty to IBC to prosecute the claim against DPW. Nippo has breached this duty by not prosecuting the claim diligently, and has breached its duties under the JV Amendment Agreement.

134. As a result of Nippo's lack of diligence in prosecuting the claim against DPW, the claim is in danger of being forfeited.

135. IBC is entitled to judgment against Nippo in the amount of $2,626,788.00 or such higher amount as may be proven at trial.

## COUNT TWELVE
### (Wake Island)

136. IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

137. On or about December 5, 2002 IBC and Nippo entered into a written Bidding and Joint Venture Agreement with respect to a solicitation for bids issued by the United States Navy for the repair and paving of a runway on Wake Island ("Wake Island Project").

26

138.     Under the terms of JV Agreement, Nippo agreed to "provide from time to time working capital that is then necessary and required to carry out and perform the Contract."

139.     On or about May 12, 2003 the Navy awarded the Wake Island Project to the IBC/ Nippo Joint Venture.

140.     On or about May 26, 2003 the Joint Venture entered into a subcontract with Nippo for the work under the Wake Island Project.

141.     Under the subcontract to Nippo the Joint Venture agreed to pay Nippo all money the Joint Venture received from the Navy for the Wake Island Project.

142.     On or about May 27, 2003 Nippo entered into a sub-subcontract with IBC under the terms of which IBC agreed to perform the work required on the Wake Island Project, and Nippo agreed to pay the costs of the project.

143.     Under the sub-subcontract agreement, the parties agreed that IBC would be paid 94% of all money received from Navy on the Wake Island Project.

144.     Work on the Wake Island project has been completed.

145.     IBC faithfully and fully performed all duties required of it under the sub-subcontract agreement on the Wake Island project.

146.     IBC has a claim against Nippo, under the sub-subcontract, for work performed on the Wake Island project in the amount of $6,750,070 for changed conditions and change orders on the project. Nippo in turn has a claim against the Joint Venture in the same amount, and the Joint Venture has a claim against the Navy in the same amount.

147.    IBC, from the inception of the work on the contract, made note of the changed conditions and kept proper records and documents of such changes in order to be able to present a proper claim to the Navy.  IBC also gave the Navy early and periodic notice of such changes.

148.    IBC  prepared a claim to be presented to the Navy on behalf of the Joint Venture. Nippo has certified the claim prepared by IBC as being true and accurate and has submitted a claim to the Navy in the amount of $6,750,070 on behalf of the Joint Venture.

149.    Pursuant to the JV Amended Agreement, Nippo has assumed responsibility for prosecuting the Wake Island claim.

## COUNT THIRTEEN
(Wake Island Progress Payments)

150.    IBC incorporates the allegations set forth in paragraphs 1 through 15 and 137 through 149 of this counterclaim as though set forth herein.

151.    There is currently due to the Joint Venture, on the Wake Island project, the sum of $2,172,383 in progress payments.

152.    Pursuant to the terms of the sub-subcontract agreement, IBC, as a sub-subcontractor, is owed 94% of these progress payments.

153.    The progress payments described above are not part of the $6,750,070 claim which the Joint Vent which has submitted to the Navy.

154.    IBC is entitled to judgment against Nippo in the amount of 94% of $2,172,383, namely, $2,042,040.

## COUNT FOURTEEN
(AMEC)

155.    IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

156.    On or about February 25, 2005 IBC and Nippo entered into a written Bidding and Joint Venture Agreement with respect to a subcontract bid on the  North Runway Repair  project on Anderson Air Force Base, Guam on which AMEC Earth and Environmental, Inc. Was the prime contractor ("AMEC project").

157.    On or about April 25, 2005 AMEC awarded the AMEC project to the  Nippo / IBC Joint Venture.

158.    The parties did not enter into a subcontract or sub-subcontract with each other on this project, and the project is being prosecuted strictly as a joint venture project.

159.    Initially, IBC was the managing party on the project and responsible for the day to day work on the project.  On or about January 26, 2006 Nippo and IBC entered into a Joint Venture Agreement Amendment ("Amended Agreement") to be effective December 1, 2005under which the parties agreed, inter alia, that the joint venture agreements would "continue in effect" but that Nippo would henceforth be the managing party on the projects, including the AMEC project.

160.    In January 2006 Nippo took control of the actual operation and management of the AMEC project.  At the time Nippo took control, work on the project was slightly behind schedule, but the project could have been completed by the June deadline specified under the contract with AMEC.

161.    Since taking over control of the project, Nippo has constantly mismanaged the project.  As a  non-exclusive list of examples of mismanagement Nippo: has overstaffed the

29

project by dozens of workers, resulting in excessive labor costs; it has insisted on using equipment supplied by Nippo which was ill suited for the project, resulting in substantial delays and unacceptable work; it has failed to supervise the project correctly resulting in a directive from the Owner that more than $1.2 million in paving be ripped out and redone; it has failed to properly prosecute work on the project resulting in at least two stop work orders being issued against the Joint Venture by AMEC and a cure letter being sent to the Joint Venture's bonding company advising the bonding company that the contract with the Joint Venture might be terminated for poor or non-performance; and, has poorly prosecuted work on the project resulting in the imposition of liquidated damages in the amount of $2,500 per day since June 29, 2006.

162.     Work on the AMEC project is not yet complete. Upon information and belief, IBC alleges that AMEC is considering terminating the contract with the Joint Venture as a result of Nippo's mismanagement of the project. IBC has complained to Nippo's board of directors about the mismanagement on the project, but Nippo's board has refused to take steps to correct the problem and properly manage the project.

163.     As a result of Nippo's breach of contract and mismanagement as set forth above, IBC has suffered damages in the amount of not less than $1,350,000.00.

164.     The full extent of damages suffered by IBC will not be know until the work has been completed and a full audit of the project provided.

165.     As a result of Nippo's breach of the AMEC sub-subcontract, as set forth above, IBC is entitled to judgment in the amount of not less than $1,350,000.00 and such higher amount as may be proven at trial.

## COUNT FIFTEEN
(Palmer)

166. IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

167. In the spring of 2005 IBC and Nippo entered into an oral Bidding and Joint Venture Agreement with respect to a solicitation from the City of Palmer, Alaska, Department of Public Works for the Palmer Southwest Utility System Extension project ("Palmer project").

168. The parties did not expressly agree to the percentage of ownership each party would have in the Palmer project Joint Venture.

169. On or about June 17, 2005 the City of Palmer awarded the Palmer project to the IBC / Nippo joint venture.

170. Nippo and IBC have not entered into subcontracts or sub-subcontracts with each other on the Palmer project, and the project is being prosecuted strictly as joint venture project.

171. Since December 1, 2005 Nippo has been the managing party for the Joint Venture on the Palmer project, and Nippo has exclusively controlled work on the project since January 2006.

172. The Palmer project has not yet been completed, but work is expected to be completed in October 2006.

173. Under the oral Joint Venture Agreement, Nippo has a duty to provide periodic reports to IBC, and IBC is entitled to information regarding the status of the work, costs, estimates and progress on the project.

174. Nippo has breached its duty to keep IBC informed on the status of the project and IBC does not have current information regarding the project.

31

175. Based upon Nippo's prosecution of the work on other projects, IBC believes that Nippo has mismanaged the Palmer project and violated its duties under the oral joint venture agreement. IBC is unable to articulate it precise claims regarding this project without an accounting from Nippo on the work, finances and prosecution of the project.

176. IBC is entitled to an accounting on this project in order that it may bring additional claims relating to the mismanagement of the project and the breach of the oral joint venture agreement which may be uncovered through such accounting.

## COUNT SIXTEEN
(Anvik)

177. IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

178. On or about June 15, 2005 IBC and Nippo entered into a written Bidding and Joint Venture Agreement under with respect to a solicitation from the State of Alaska Department of Transportation for the Anvik Airport Improvement Project ("Anvik project").

179. Under the terms of the Joint Venture Agreement for the Anvik project Nippo has a 60% interest in the joint venture and IBC has a 40% interest.

180. On or about August 19, 2005 the Alaska Department of Transportation awarded the Anvik project to the IBC / Nippo joint venture.

181. Nippo and IBC have not entered into subcontracts or sub-subcontracts with each other on the Anvik project, and the project is being prosecuted strictly as joint venture project.

182. Since December 1, 2005 Nippo has been the managing party for the Joint Venture on the Anvik project, and Nippo has exclusively controlled work on the project since January 2006.

32

183.   The Anvik project has not yet been completed, and work is not expected to be completed until the fall of 2007.

184.   Under the Joint Venture Agreement, Nippo has a duty to provide periodic reports to IBC, and IBC is entitled to information regarding the status of the work, costs, estimates and progress on the project.

185.   Nippo has breached its duty to keep IBC informed on the status of the project and IBC does not have current information regarding the project.

186.   Upon information and belief, Nippo has a duty to prosecute the work on the project in a competent manner. Nippo has breached this duty and has mismanaged the project by, among other things: failing to properly anticipate and plan for fuel needs for equipment being used on the projects, resulting in Nippo being required to bring in fuel by air shipment at significantly greater cost than shipment by surface means; purchasing unnecessary equipment thereby needlessly increasing project costs; and, mismanagement of aggregate sources.

187.   As a result of Nippo's breach of the Anvik Project, as set forth above, IBC is entitled to judgment in an amount to be proven at trial.

### COUNT SEVENTEEN
(Koyukuk)

188.   IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

189.   On or about July 15, 2003 IBC and Nippo entered into an oral Bidding and Joint Venture Agreement with respect to a solicitation from the State of Alaska Department of Transportation for the Koyukuk Airport Improvements project("Koyukuk project").

190. The Joint Venture Agreement provided that Nippo would have a 60% interest in the joint venture and IBC a 40% interest.

191. On or about August 3, 2003 the State of Alaska awarded the Koyukuk project to the IBC / Nippo joint venture.

192. On or about November 10, 2003 the IBC / Nippo Joint Venture entered into a subcontract with Nippo for the work under the Koyukuk project.

193. Under the subcontract to Nippo the Joint Venture agreed to pay Nippo all money the Joint Venture received from the State of Alaska on the Koyukuk project.

194. On or about November 11, 2003 Nippo entered into a sub-subcontract with IBC under the terms of which IBC agreed to perform the work required on the Koyukuk project, and Nippo agreed to pay the costs of the project.

195. Under the sub-subcontract agreement, the parties agreed that IBC would be paid 96% of all money received from the State of Alaska on the Koyukuk project.

196. Since December 1, 2005 Nippo has been the managing party for the Joint Venture on the Koyukuk project, and Nippo has exclusively controlled work on the project since January 2006.

197. IBC does not know if work on the Koyukuk project has been completed.

198. Under the oral Joint Venture Agreement, Nippo has a duty to provide periodic reports to IBC, and IBC is entitled to information regarding the status of the work, costs, estimates and progress on the project.

199. Nippo has breached its duty to keep IBC informed on the status of the project and IBC does not have current information regarding the project.

34

200. Based upon Nippo's prosecution of the work on other projects, IBC believes that Nippo has mismanaged the Koyukuk project and violated its duties under the oral joint venture agreement. IBC is unable to articulate its precise claims regarding this project without an accounting from Nippo on the work, finances and prosecution of the project.

201. IBC is entitled to an accounting on this project in order that it may bring additional claims relating to an mismanagement of breach of the oral joint venture agreement which may be uncovered through such accounting.

## COUNT EIGHTEEN
### (Accounting)

202. IBC incorporates the allegations set forth in paragraphs 1 through 201 of this counterclaim as though set forth herein.

203. As alleged herein above, IBC as a joint venture partner on the projects set forth in this counterclaim. Moreover, although IBC was required pursuant to the joint venture agreements to bear the risk of loss in connection with the construction work, Nippo has been required to advance many millions of dollars to keep the construction projects going forward inasmuch as many of the projects have suffered large losses which IBC has been unable to pay. Nippo has never been reimbursed by IBC for these losses.

204. IBC does not have sufficient information about the actual costs of the construction and the utilization of the joint venture funds to compute a precise allocation of the debts and expenditures incurred, nor does it have adequate information to determine for what purposes joint venture funds were put to use by Nippo, or the extent to which such funds were needlessly or wastefully expended, or the extent to which funds were expended as a result of mismanagement by Nippo. IBC is further unable to determine, without a full accounting, whether it has fully been

35

given credit for amounts on which it is entitled to credit, or whether there is additional money owed to the Joint Venture the payment of which is not being pursued by Nippo.

205.    IBC is entitled to a full and complete accounting of the joint venture affairs so that its profits, losses and diverted funds can all be accounted for, properly apportioned, and pursued through further litigation against other entities and individuals, if necessary.

## COUNT NINETEEN
(Credits for Sale of Alaska Equipment and Assets)

206.    IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

207.    Pursuant to the terms of an Agreement and Bill of Sale signed on January 23, 2006 and made effective December 1, 2005, Nippo purchased the equipment and assets of IBC's Alaska office for the sale price of $2,641,130.

208.    Pursuant to the terms of the Bill of Sale IBC is entitled to a credit in that amount of $2,641,130 to be applied to any amount Nippo claims IBC owes to Nippo.

## COUNT TWENTY
(Bidding Costs Unsuccessful)

209.    IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

210.    In addition to the projects described in the counterclaims herein above, Nippo and IBC from time to time entered into bidding and joint venture agreements on which the parties submitted bids as joint venture partners but were not awarded the contracts on the projects ("unsuccessful bids").

211. IBC was the joint venture partner which prepared the bids and incurred most of the costs associated with the bid preparation.

212. Nippo is liable for a portion of the costs associated with the preparation and submission of the unsuccessful bids in an amount equal to Nippo's interest in the particular joint venture, which was never less than 40%.

213. Nippo owes IBC $450,000, as Nippo's shares of costs associated with the preparation and submission of the unsuccessful bids.

214. IBC is entitled to a judgment against Nippo in the amount of $450,000 for unsuccessful bid costs.

## COUNT TWENTY- ONE
(Cost Incurred by IBC on Alaska Projects Through October 31, 2005)

215. IBC incorporates the allegations set forth in paragraphs 1 through 15 of this counterclaim as though set forth herein.

216. Under the terms of JV Amendment Agreement, Nippo was required to pay to IBC the costs incurred by IBC with respect to the operation of its Alaska office, to the extent provided in the project bid estimates, through October 31, 2005.

217. IBC incurred office expenses of $320,000 for the operation and maintenance of its Alaska office, through October 31, 2005, which costs were provided in the project bid estimates.

218. Nippo owes IBC $320,000 for costs incurred by IBC in the operation and maintenance of its Alaska office as set forth above.

37

## COUNT TWENTY-TWO
### (Attorney Fees)

219. IBC incorporates the allegations set forth in paragraphs 1 through 205 of this counterclaim as though set forth herein.

220. As a result of Nippo's breach of the Joint Venture Agreements, the sub-subcontracts, the JV Amendment, the Equipment Rental Agreement, and the Bill of Sale Agreement (Alaska) as more fully set forth in the earlier counts of this counterclaim, IBC has been required to retain counsel to represent it with respect to such breaches.

221. Pursuant to the terms of the aforesaid agreements, IBC is entitled to attorneys fees incurred as a result of Nippo's breach of such agreements, in an amount to be proven at trial.

**WHEREFORE**, defendants pray that the complaint of Nippo be dismissed and that it take nothing thereby. IBC, and IBCM on Counts Three and Six only, further pray that judgment be entered in its favor on their counterclaims as follows:

1. On Count One, judgment in the amount of $550,000.00 or such higher amount as may be proven at trial;

2. On Count Two, judgment in the amount of not less than $1,350,000.00 or such higher amount as may be proven at trial;

3. On Count Three, judgment in the amount of $1,326,635.00, or such greater amount as may be proven at trial;

4. On Count Four, according to proof at trial;

5. On Count Five, judgment in the amount of $1,450,000.00, or such higher amount as may be proven at trial;

6.      On Count Six, judgment in the amount of $1,374,569.00, or such greater amount as may be proven at trial;

7.      On Count Seven, judgment in the amount of $150,000, or such greater amount as may be proven at trial;

8.      On Count Eight, judgment in the amount of $1,375,000.00, or such greater amount as may be proven at trial;

9.      On Count Nine, judgment in the amount of $400,000, or such greater amount as may be proven at trial;

10.     On Count Ten, judgment in the amount of $300,800;

11.     On Count Eleven, judgment in the amount of $1,375,000.00, or such higher amount as may be proven at trial;

12.     On Count Twelve, judgment in the amount of $6,750,070;

13.     On Count Thirteen, judgment in the amount of $2,042,040;

14.     On Count Fourteen, judgment in the amount of $1,350,000.00, or such greater amount as may be proven at trial;

15.     On Count Fifteen, damages according to proof at trial;

16.     On Count Sixteen, damages according to proof at trial;

17.     On Count Seventeen, damages according to proof at trial;

18.     On Count Eighteen, an accounting from Nippo of all projects identified in the counterclaim;

19.     On Count Nineteen, judgment in the amount of $2,641,130;

20.     On Count Twenty, judgment in the amount of $450,000;

39

21. On Count Twenty-One, judgment in the amount of $320,000;

22. On Count Twenty-Two, judgment in the amount of attorneys fees incurred by IBC according to proof at trial.

23. Prejudgment and post-judgement interest;

24. Such other relief as the Court may determine appropriate.

DATED at Hagåtña, Guam, this 12th day of September, 2006.

**CIVILLE & TANG, PLLC**

By _____
**G. PATRICK CIVILLE**
*Attorneys for Defendants/Counterclaimants*

## DEMAND FOR JURY TRIAL

Defendants demand a jury trial for the adjudication of all claims in Plaintiff's Amended Complaint and Defendant IBC's Counterclaim for which a jury trial is available under the Seventh Amendment of the United States Constitution.

DATED at Hagåtña, Guam, this 12th day of September, 2006.

**CIVILLE & TANG, PLLC**

By: _____
**G. PATRICK CIVILLE**
*Attorneys for Defendants/Counterclaimants*

## CERTIFICATE OF SERVICE

I, G. PATRICK CIVILLE, hereby certify that on September 12, 2006, a copy of the foregoing document was duly served by hand-delivery on Thomas C. Sterling, Esq., Blair Sterling Johnson Moody Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagåtña, Guam.

DATED at Hagåtña, Guam, this 12th day of September, 2006.

**CIVILLE & TANG, PLLC**

By: _____
**G. PATRICK CIVILLE**
*Attorneys for Defendants/Counterclaimants*